V. Lorraine CARTER, Plaintiff,

v.

CORNELL UNIVERSITY a/k/a Cornell
University Medical College and
Ronald Phillips, Defendants.

No. 96 Civ. 5927(CBM).

United States District Court,
S.D. New York.

Sept. 4, 1997.

Gregory Antolino, New York City, for V. Lorraine Carter.

Valerie L. Cross, Office of University Counsel, Cornell University, Ithaca, NY, for Cornell University Medical College, Ronald Phillips.

## OPINION

MOTLEY, District Judge.

Plaintiff in this case claims that she has been denied promotions, harassed and otherwise discriminated against because of her race in violation of Title VII and related anti-discrimination laws. The following constitutes the court's findings of fact and conclusions of law on the subject.

## FINDINGS OF FACT

**The Parties**

1. Plaintiff V. Lorraine Carter is a black female employed as a senior administrative secretary at defendant Cornell University Medical College ("Cornell"). (Joint Pretrial Order "PTO" at ¶ 5; Tr. at 456, 475.)

2. Defendant Ronald Phillips is a white male who is also employed at defendant Cornell University Medical College. As manager of duplicating at the Biomedical Communications Department of defendant Cornell, he is plaintiff's direct supervisor. (PTO at ¶ 5; Tr. at 493–94.)

3. Defendant Cornell is a division of Cornell University and is located in New York City. (Joint Trial Exhibit 27 at 2.)

**Background**

4. Plaintiff was hired by Cornell as a temporary secretary in 1984. (Tr. at 456.) Approximately nine months later, she became a permanent employee. (Tr. at 457–58.)

5. Since becoming a permanent employee, plaintiff has been promoted three times. In 1986, she was promoted to staff secretary. (Tr. at 465–66.) In 1987, she became an administrative secretary. (Tr. at 470) Two years later, she was promoted to senior administrative secretary. (Tr. at 473–74.)

6. From 1985 to 1991, plaintiff received favorable performance evaluations. While the ratings vary from category to category, on average plaintiff was rated by her former supervisor, Michael Guilfoyle, as either "above average" or "commendable" in most categories.

7. On June 21, 1991, plaintiff was given a raise as a result of a letter written by Dr. Robert Braude, the head of Cornell's Biomedical Department, to the Human Resources Department, which noted that she was an excellent employee. (Tr. at 479–80.)

**The 1991 and 1992 Managerial Positions**

8. In 1991, Mr. Guilfoyle left Cornell. (Tr. at 483.)

9. Dr. Robert Braude, the head of Cornell's Biomedical Department, appointed defendant Phillips acting manager of the duplicating division on September 18, 1991. (Def. Ex. R; Tr. at 493–94.)

10. Dr. Braude informed plaintiff of his decision to make defendant Phillips acting manager. (Tr. at 493–94; 497.) She responded by saying that she thought defendant Phillips would make a good manager but also indicated to Dr. Braude that she wanted the position. (Tr. at 494.)

11. Defendant Phillips does not have a college degree (Tr. at 738–39), but plaintiff has an associate's degree in management and accounting from Monroe College. (Tr. at 461.)

12. The position description issued for manager of duplicating by defendant Cornell indicates that a college degree is preferred. (Def. Ex. CC; Tr. at 739–40.)

13. Plaintiff is also more experienced in office work than defendant Phillips. In fact, defendant Phillips was trained by plaintiff in office procedures soon after defendant Phillips was made acting manager. (Tr. at 494–95.)

14. Plaintiff met all of the minimum requirements necessary to fill the position. (Def.Ex. CC.)

15. However, defendant Phillips had a great deal more experience in printing and production than plaintiff. Defendant Phillips was highly trained and experienced in the printing and production work of the duplicating department. (Tr. at 720–721; 736–37.)

16. In contrast, plaintiff's experience in production was limited. She had worked in the office section of the duplicating division, not the production section. (Tr. at 677–78.) Moreover, production was not one of her job responsibilities. (Joint Exhibit 21.)

17. Though the job description for duplicating manager does not state explicitly that production experience is required, it does list the activities which the manager is expected to perform, and these activities could not be effectively performed by someone who did not have an intimate knowledge of production. For example, the manager is expected to "evaluate ... quality and reliability of equipment and supplies," "[a]nalyze cost and maximum capacity of equipment and recommend changes to increase efficiency and productivity," "[w]ork with department administrators to determine equipment needs," "visit sites and insure equipment is working properly," "[r]eview and analyze existing equipment," "[s]upervise the operation and maintenance of all department equipment," and "make on-site equipment inspection to insure that all equipment is working properly." (Def.Ex. CC.)

18. Dr. Braude made defendant Phillips permanent manager in April of 1992, approximately seven months after he had become acting manager. (Def.Ex. S.)

19. The reason that Dr. Braude chose defendant Phillips rather than plaintiff to fill the position of acting manager and ultimately permanent manager was because of his extensive experience in production relative to that of plaintiff. Neither race nor gender played a role in that decision. (Def.Ex. S.)

**1995 Promotion**

20. In 1995, a position for Administrative Assistant II was created in the duplicating department. (Tr. at 723–24.)

21. In describing the position to plaintiff, defendant Phillips indicated that an applicant needed to have knowledge of medical art and photography in order to be able to fill it. (Tr. at 672–75.)

22. The job description does not indicate that knowledge of medical art and photography is required (Joint Ex. 23.) However, plaintiff relied on defendant Phillips' representation that such knowledge was required and did not apply for the position. (Tr. at 675.) Indeed, her suspicion that applying would be futile was confirmed by Mr. Phillips' testimony that he did not think that she was as qualified as the person ultimately hired. (Tr. at 725.)

23. Defendant Phillips did concede, however, that plaintiff was "minimally qualified" for the position of Administrative Assistant II. (Tr. at 329.)

24. The original person selected to fill the position was Nancy Soto, a Hispanic female.[1] (Tr. at 347–48.) She was selected because she had good computer skills, was able to compile a budget and had worked in another medical center. (Tr. at 348–50.) However, she turned the position down, and Mr. Thomas Del Priore was then offered the job. (Tr. at 350–51.)

25. The initial recommendation to hire Mr. Del Priore was made by defendant Phillips. However, the recommendation needed to be approved by Dr. Braude and by the Human Resources Department before Mr. Del Priore could be hired. (Tr. at 725.)

26. The circumstances of Mr. Del Priore's discharge from his previous employer, the National Association of Securities Dealers ("NASD") are somewhat suspicious. When asked on cross-examination whether he was terminated or whether he was laid off, he gave inconsistent answers. (Tr. at 594–97.) Moreover, Mr. Del Priore did admit that while he was at the NASD, he had been warned about raising his voice when addressing coworkers. (Tr. at 586–87.) He also testified that he had been accused of yelling at his supervisor. (Tr. at 581–82.)

1. Though it could potentially have been dispositive on the issue of discrimination with respect to the 1995 promotion, no testimony was elicited as to whether Ms. Soto was a black Hispanic or white Hispanic.

27. However, none of this information was provided to defendant Cornell when Mr. Del Priore was hired. Mr. Del Priore had indicated on his application for employment at defendant Cornell that he was laid off by the NASD. (Tr. at 597.) Defendant did send a request for reference to the NASD, and it was returned to defendant Cornell confirming the dates at which he had worked with the NASD but not indicating the reason for his departure as defendant Cornell had requested. (Pl.Ex. 10.) Defendant Cornell did not pursue the matter further because it is very common for a form of this sort to be filled out with only the dates of hire and the last position held included thereon. (Tr. at 166–67.)

28. Defendant Phillips chose to hire Mr. Del Priore because he was very knowledgeable in computer skills, he had a good amount of financial experience, and he had been a compliance officer at the NASD, which defendant Phillips thought would be useful in meeting the requirements of defendant Cornell's auditing department. (Tr. at 351–52.)

29. Neither race nor gender played a role in Phillips' decision. (Tr. at 352.)

## Hostile Work Environment/Poor Performance Evaluations

30. Until fairly recently, defendant Phillips and plaintiff were on generally good terms. Plaintiff had bought a gift for defendant Phillips' daughter when she was born, and defendant Phillips coordinated the purchase of a wedding present for plaintiff when she got married. (Tr. at 360.)

31. Mr. Phillips also coordinated the purchase of a gift for another African–American employee in the duplicating division, Ms. Gail Jones. (Tr. at 261–62.)

32. Furthermore, Mr. Phillips agreed to handle some of Ms. Jones' job responsibilities at a time that she was having personal problems. (Tr. at 260–61.)

33. Finally, Mr. Phillips loaned money to Ms. Jones when she needed it, he drove her to her babysitter's house on occasion, and he exchanged Christmas cards with her. (Tr. at 262–63.)

34. Nonetheless, the atmosphere in the duplicating division has not been entirely congenial, particularly in recent years. When defendant Phillips was made permanent manager of the duplicating department in 1992, he became responsible for completing plaintiff's performance evaluations. (Tr. at 498.) From that time, the ratings plaintiff has received in her evaluation have slowly gotten worse, such that she is now rated in most categories as "average," a considerable drop from her earlier ratings of "above average" and "commendable." *See* ¶ 6 *supra.* Defendant Phillips has suggested that the reason for this drop is due to her increasingly poor job performance. (Tr. at 729–34.) In fact, one customer expressly stated that she did not wish to deal with plaintiff in the future. (Tr. at 731.)

35. However, the consensus in the office seemed to be that plaintiff was quite capable at performing her job. Mr. Kevin Curriotto, another employee in the Biomedical Communications department, has testified that she "does a fine job." (Tr. at 193.) Moreover, Ms. Jones has testified that plaintiff's job performance has improved over the years, an opinion totally inconsistent with her declining ratings. (Tr. at 202–03.) Finally, Mr. Luis Vargas, another employee of defendant Cornell who worked with plaintiff, indicated that she was "very professional." (Tr. at 401–02.)

36. As a result, the court does not deem credible defendant Phillips' testimony that he gave her poor evaluations because her job performance started to decline.

37. Defendant Phillips has made some racially insensitive comments in the years that he has been at defendant Cornell. On one occasion, while in the presence of Ms. Jones and Ms. Carter, he referred to Mayor Dinkins as "your boy." (Tr. at 726.) Defendant Phillips also stated on another occasion that Rodney King would not have been beaten had he not run from the police. (Tr. at 221.) He indicated on yet another occasion that he did not think that Rev. Martin Luther King, Jr. deserved a national holiday (Tr. at 223–24) and also stated once that the black employees in the duplicating division (to wit, Ms. Jones and plaintiff) celebrated the day that the O.J. Simpson verdict was announced.

(Tr. at 383.) Finally, Ms. Jones testified that defendant Phillips told her that he once refused to board an elevator with three "rough looking" black men on it and that he could not hire a black nanny for his daughter because he was afraid of the neighborhood reacting negatively to the presence of an African–American. (Tr. at 222–23.)

38. Defendant Phillips has stated that he took managerial and supervisory responsibility away from plaintiff in 1993. (Tr. at 370.) Defendant indicated that he had done this because he felt that plaintiff was unduly argumentative and did not always agree with policies he was intending to implement. (Tr. at 375.) Mr. Vargas, another employee at defendant Cornell, gave a different reason. He suggested that defendant Phillips had grown jealous of plaintiff's power within the department and he sought to "break her power." (Tr. at 379–80.)

39. Thus, it seems clear that there was a growing personal animosity between plaintiff and defendant Phillips that was responsible for defendant Phillips giving her poor performance evaluations and taking managerial and supervisory responsibility away from her. Rather than attempt to discern the source of this animosity, however, the court does no more than conclude that there is not enough evidence to support the notion that it is related to plaintiff's race or gender. Though Mr. Phillips' repeated comments on the issue of race suggest that he is not as sensitive as he should be, in themselves they do not prove that his actions vis-a-vis plaintiff derive from racial animus, particularly in light of the reasonably friendly relationship he had with both plaintiff and Ms. Jones until fairly recently.

40. Mr. Del Priore has also raised his voice against plaintiff. On one occasion, he ordered her in a harsh tone to do something which was not part of her job responsibility. (Tr. at 170–71.) On another occasion, Mr. Del Priore threw a memo in plaintiff's face. (Tr. at 537–38.) Plaintiff also testified that

Mr. Del Priore would appear at her desk every morning and demand that she perform certain tasks. (Tr. at 541.) She also testified that he screamed at her frequently. (Tr. at 541.) As a result of these incidents, plaintiff felt intimidated and threatened. (Tr. at 541–42.)

41. Plaintiff did complain on numerous occasions to Human Resources, Mr. Braude, and Mr. Phillips regarding Mr. Del Priore's behavior. Defendant Phillips responded to these and other complaints by other coworkers by (1) instructing Mr. Del Priore not to yell at coworkers (2) extending his probation for one month, and (3) speaking to Mr. Del Priore about his interpersonal skills. (Tr. at 606–08, 667.)

42. Ms. Jones claimed that she had no difficulties with Mr. Del Priore. (Tr. at 254–55.) There is no evidence to suggest that any of Mr. Del Priore's actions stemmed from racial animus or gender bias.

## CONCLUSIONS OF LAW

### I. Title VII Claims

1. In order to establish a *prima facie* case of race or gender[2] discrimination in the terms and conditions of employment under Title VII, the court must apply the familiar three-step burden shifting analysis set forth by the Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253–57, 101 S.Ct. 1089, 1093–96, 67 L.Ed.2d 207 (1981), further described in *St. Mary's Honor Center v. Hicks* 509 U.S. 502, 505–512, 113 S.Ct. 2742, 2746–50, 125 L.Ed.2d 407 (1993), and most recently clarified by the Second Circuit in the case of *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997)(en banc).

### A. Promotions

2. Under the *McDonnell Douglas* analysis, a *prima facie* case of discriminatory deni-

---

2. By order dated November 8, 1996, this court dismissed the sex discrimination claims raised by plaintiff under Title VII on the grounds that she had failed to include them in the Charge of Discrimination she had filed with the Equal Employment Opportunity Commission ("EEOC").

However, because plaintiff has raised Title IX claims dealing with sex discrimination and because Title IX adopts Title VII substantive standards, *see* ¶ 21 *infra,* the court deals with both gender and race discrimination under Title VII.

al of promotion involves proof of four elements: (1) membership in a protected class, (2) qualification for a position for which the employer sought applicants and for which the plaintiff applied, and (3) failure to promote in circumstances giving rise to an inference of discrimination (such as the promotion of a person not from the protected class). *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094; *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996).

3. It is important to note, however, that though plaintiff is theoretically required to apply for the job to satisfy the *prima facie* case, she need not do so if she knows that her application would be rejected. In the words of the Supreme Court, "[s]uch a per se prohibition of relief to nonapplicants could thus put beyond the reach of equity the most invidious effects of employment discrimination.... [This] limitation on the equitable powers granted to courts by Title VII would be manifestly inconsistent ... with the 'historic purpose of equity to secure complete justice.'" *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 367, 97 S.Ct. 1843, 1870–71, 52 L.Ed.2d 396 (1977)(quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)). *See also Grant v. Bethlehem Steel Corp.,* 635 F.2d 1007, 1016 (2d Cir.1980)(quoting *Teamsters* ).

4. The *prima facie* case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Nonetheless, as the Second Circuit has stated, the plaintiff's burden of establishing a *prima facie* case has often been described as "minimal." *Fisher,* 114 F.3d at 1335 (*citing Hicks* ).

5. Once plaintiff has established her *prima facie* case of discrimination based on race or gender, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (quoting *McDonnell Douglas,* 411

U.S. at 802, 93 S.Ct. at 1824); *Fisher,* 114 F.3d at 1335. *See also Hicks,* 509 U.S. at 506–507, 113 S.Ct. at 2747. At this stage, the defendant "must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 254–255 & n. 8, 101 S.Ct. at 1094–95 & n. 8). *See also Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 203 (2d Cir.1995)(same).

6. "It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Hicks,* 509 U.S. at 507, 113 S.Ct. at 2747 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093) (alteration in *Hicks* ). "Any legitimate, nondiscriminatory reason will rebut the presumption triggered by the *prima facie* case" and "the defendant does not need to persuade the court that it was actually motivated by the proffered reason in order to nullify the plaintiff and obligate him to satisfy the burden of proof." *Fisher,* 114 F.3d at 1336.

7. Once defendant carries this burden of production, the *McDonnell Douglas* framework "simply drops out of the picture" and both the Supreme Court and the Second Circuit warn against its subsequent resurrection. *Hicks,* 509 U.S. at 510–11, 113 S.Ct. at 2749; *Fisher,* 114 F.3d at 1336. "In particular, the presumption of discrimination that was raised upon a showing of the *prima facie* case no longer operates." *Id.*

8. In order to sustain his burden of persuasion at this stage, plaintiff must be afforded an opportunity to prove that the reasons articulated for the adverse decision were a pretext for discrimination. *Burdine,* 450 U.S. at 256–57, 101 S.Ct. at 1095; *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985). The plaintiff, however, must satisfy two different elements: first, that the legitimate, nondiscriminatory reason was not the true reason for the adverse employment decision, and

second, that race (or gender) was. *Hicks,* 509 U.S. at 507–08, 113 S.Ct. at 2747.

9. The court holds that a *prima facie* case of denial of promotion has been established for the three positions plaintiff sought; to wit, acting manager in 1991, permanent manager in 1992, and Administrative Assistant II in 1995. As a black female, plaintiff was a member of a protected class. *Holt,* 95 F.3d at 129. Moreover, plaintiff met all of the requirements necessary to be acting and permanent manager, *see* Findings of Fact, ¶ 14 *supra,* and defendant Phillips admitted that she was qualified to be Administrative Assistant II. *See* Findings of Fact, ¶ 23 *supra.* She "applied" for the positions of acting manager and permanent manager insofar as she was able by telling Dr. Braude that she was interested in the positions, *see* Findings of Fact, ¶ 10 *supra,* and, though she did not apply for the position of Administrative Assistant II, she did not need to because it would have been futile to do so. *See* Findings of Fact, ¶ 22 *supra.* Finally, in all of the positions which she sought, a white male was hired in her place, and this alone is sufficient to raise an inference of discrimination. *Holt,* 95 F.3d at 129.

10. However, plaintiff has failed to sustain her burden of proving that the legitimate nondiscriminatory reasons produced by defendant Cornell for the hiring of Mr. Del Priore and defendant Phillips are pretextual. As was noted in ¶ 15 of the Findings of Fact *supra,* defendant Phillips was far more experienced than plaintiff in production, Given the tasks that the manager of the duplicating department was expected to perform, defendant Cornell's claim that it hired defendant Phillips instead of plaintiff because of the disparity in their experience in production appears perfectly reasonable. Furthermore, even assuming that the proffered reason was pretextual, there is little evidence to support the notion that the real reason that plaintiff was not promoted was due to race or gender. Thus, plaintiff's claim that she was discriminated against by not being promoted must be dismissed.

## B. Evaluations

11. The *prima facie* case which plaintiff must establish to show that she suffered an adverse employment action in violation of Title VII likewise consists of three elements: (1) membership in a protected class, (2) qualification for her position, and (3) adverse treatment in circumstances giving rise to an inference of discrimination. *See McDonnell Douglas,* 411 U.S. at 802 & nn. 13–14, 93 S.Ct. at 1824 & nn. 13–14.

12. As was explained in ¶¶ 5–6 *supra,* if plaintiff establishes the *prima facie* case, the burden of production shifts to plaintiff to provide a legitimate nondiscriminatory reason for the adverse treatment. The plaintiff, however, carries the burden of persuading the trier of fact both (1) that the nondiscriminatory reason provided by defendant is pretextual, and (2) that the real reason for the adverse treatment was race or gender. *See* ¶ 8 *supra.*

13. Plaintiff has established the *prima facie* case—she is a member of a protected class, she is clearly qualified for her current position, and the fact that her evaluations have become worse since defendant Phillips was made supervisor is sufficient to invoke an inference of discrimination. *See Fisher,* 114 F.3d at 1335 (stating that *prima facie* burden is not difficult to establish).

14. The court has concluded that defendant Phillips' allegation that plaintiff's poor evaluations are related to her allegedly poor performance is entirely pretextual. *See* Findings of Fact, ¶ 36 *supra.* However, plaintiff has not proven that the real reason that defendant Phillips gave her such poor evaluations was because of race or gender. In fact, the testimony elicited from Mr. Vargas, one of plaintiff's witnesses, suggests that defendant Phillips was threatened that plaintiff had too much power within the department and therefore sought to "break her". *See* Findings of Fact, ¶ 38 *supra.* In addition, there was ample evidence suggesting that the poor evaluations may have been the result of a personal animosity that had arisen between defendant Phillips and plaintiff that had nothing to do with race or gender. *See*

Findings of Fact, ¶ 40 *supra.* Thus, because plaintiff has failed to sustain her burden of proving that the poor evaluations were in fact due to "impermissible factors," no Title VII claim lies.

### Hostile Work Environment

15. The Supreme Court has noted on more than one occasion that the prohibition contained in Title VII against discrimination "with respect to . . . compensation, terms conditions, or privileges of employment because of . . . race [or] sex . . .," 42 U.S.C. § 2000e–2(a)(1), is not limited to "economic or tangible discrimination," but rather "evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986))(internal quotation marks omitted).

16. Thus, "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (citations omitted); *Meritor,* 477 U.S. at 65, 106 S.Ct. at 2405.

17. However, "mere utterance of an . . . epithet which endangers offensive feelings in a employee" does not sufficiently affect the conditions of employment to implicate Title VII. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (citations omitted); *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405–06. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment . . . is beyond Title VII's purview." *Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (citations omitted); *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2405.

18. Whether an environment is hostile or abusive can only be viewing the totality of the circumstances. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370; *Jemmott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996).

19. Finally, it need be noted that a hostile or abusive environment is not actionable under Title VII unless the alleged conduct "was caused by discriminatory animus." *Jemmott,* 85 F.3d at 67.

■ 20. Plaintiff has failed to prove that the environment in which she was working was discriminatorily hostile or abusive. While in no way condoning defendant Phillips' disparaging comments on the issue of race, they do not in themselves constitute a "hostile" or "abusive" environment because there were at most six such comments, and they were made over a period of years.

In fact, the only conduct which took place in the workplace which could even be considered "hostile" or "abusive" involved Mr. Del Priore. However, because there is no evidence to support the notion that Mr. Del Priore's conduct was caused by discriminatory animus, his actions do not lead to a Title VII violation.

### Title IX Claims

21. The Second Circuit has held that Title VII standards are to be applied in interpreting Title IX of the Education Amendments of 1972, 20 U.S.C. § 1981–1988, which prohibits discrimination on the basis of gender in educational programs and activities receiving federal financial assistance. *Torres v. Pisano,* 116 F.3d 625, 630 n. 3 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 248 (2d Cir.1995). Thus, for the reasons provided in ¶¶ 1–20 *supra,* plaintiff cannot show a Title IX violation on the basis of gender.

22. Accordingly, the court does not reach the question of whether Title IX extends to employees involved in federally funded educational programs. *Compare Lakoski v. James,* 66 F.3d 751, 754 (5th Cir.1995)("Given the availability of a private remedy under Title VII for aggrieved employees, we are unwilling to [find] . . . an implied right of action for employment discrimination") *with Henschke v. New York Hospital–Cornell Medical Center,* 821 F.Supp. 166, 171–73 (S.D.N.Y.1993) (holding that a private right of action does indeed exist under Title IX for

employees involved in federally funded educational programs).

### Claims Under 42 U.S.C. § 1981

23. Title VII standards are also applied to claims of unlawful discrimination under 42 U.S.C. § 1981. *Hargett v. National Westminster Bank, U.S.A.,* 78 F.3d 836, 838, *cert. denied,* —— U.S. ——, 117 S.Ct. 84, 136 L.Ed.2d 41 (1996). Accordingly, the court concludes that plaintiff has failed to prove a violation of 42 U.S.C. § 1981.

### Claims Under New York Executive Law and the Administrative Code New York City

24. New York courts require the same standard of proof for claims brought under § 296 of the New York Executive Law as is required for those brought under Title VII. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 n. 4 (2d Cir.1995); *see also Miller Brewing Co. v. St. Div. of Human Rights,* 66 N.Y.2d 937, 498 N.Y.S.2d 776, 489 N.E.2d 745 (1985). The same may be said for employment discrimination claims raised under the Administrative Code of the City of New York. *Alie v. NYNEX Corp.,* 158 F.R.D. 239, 244 (E.D.N.Y.1994); *Landwehr v. Grey Advertising, Inc.,* 211 A.D.2d 583, 622 N.Y.S.2d 17, 18 (1st Dep't 1995). The court thus dismisses these claims as well.

### *Prima Facie* Tort

25. Under New York law, the elements necessary to establish a *prima facie* tort are (1) intentional infliction of harm, (2) resulting in special damages, (3) without excuse or justification, (4) by an otherwise lawful act. *Hughes v. Patrolmen's Benevolent Assoc. of the City of New York, Inc.,* 850 F.2d 876, 882 (2d Cir.1988); *Hannah v. Metro–North Commuter Railroad Co.,* 753 F.Supp. 1169, 1177 (S.D.N.Y.1990).

26. As regards the first element, the Second Circuit has held:

> The sole motivation for the damaging acts must have been a malicious intention to injure plaintiff. Where there are other motives, such as profit, self-interest, or business advantage, there is no recovery under the doctrine of *prima facie* tort.

*Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985). Plaintiff has proved no facts which could lead to the court's conclusion that defendants acted toward plaintiff with such disinterested malevolence.

27. Plaintiff has maintained that Phillips' statement to Vargas that he intended to "break [plaintiff's] power," exhibited disinterested malevolence. Even if the court were to credit Mr. Vargas' testimony and assume that defendant Phillips did indeed make the statement, the evidence suggests that defendant Phillips sought to take this action out of his own self-interest. He felt threatened by plaintiff's influence at Cornell, and he sought to diminish that influence.

28. The only other conduct which could even arguably satisfy the first element of the *prima facie* tort was Mr. Del Priore's treatment of plaintiff. However, though Mr. Del Priore does seem to have been unduly harsh with plaintiff on more than one occasion, plaintiff has not proven that he maliciously intended to injure her.

29. Thus, the court concludes that defendants are not liable under the *prima facie* tort.

### Intentional Infliction of Emotional Distress

30. In order to sustain a claim for intentional infliction of emotional distress, a litigant must establish four elements: (1) extreme and outrageous conduct on the part of defendants, (2) intent on the part of the defendant to cause, or disregard of a substantial probability of causing, severe emotional distress, (3) a causal connection between defendants' conduct and the injury suffered, and (4) severe emotional distress suffered by plaintiff. *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699, 702 (1993); *Wolff v. City of New York Financial Services,* 939 F.Supp. 258, 263 (S.D.N.Y.1996).

31. In order to satisfy the first element of a claim of intentional infliction of emotional distress, the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."

**234**

*Wolff,* 939 F.Supp. at 263. Moreover, the Second Circuit has stated approvingly that New York courts have been very strict in applying this test. *Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d. Cir.1985).

32. The court readily concludes that there is no evidence showing the existence of conduct that is so extreme and outrageous that it satisfies the first element of this tort. Accordingly, the claim is dismissed.

### CONCLUSION

The court has determined that plaintiff has failed to prove any of her claims and therefore dismisses the case from this court with each party to bear its own costs.