**Nayda JIMENEZ, Plaintiff,**

v.

**BIG M, INC., Defendant.**

**No. 99 CIV. 390 (SAS).**

United States District Court,
S.D. New York.

Jan. 19, 2000.

Douglas Kaplan, Merrick, NY, for Plaintiff.

David J. Silberman, Grotta, Glassman & Hoffman, New York City, for Defendant.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiff Nayda Jimenez, a former Big M employee, commenced an action in New York Supreme Court, Bronx County alleging national origin discrimination under the New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* Defendant removed the case to federal court on the basis of diversity of citizenship and now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons discussed below, defendant's motion is granted and this case is dismissed.

### I. Factual Background

Big M, Inc. owns and operates approximately one hundred and seventy women's clothing stores along the Eastern seaboard under the names "Mandee" and "Annie Sez." Affirmation of David J. Silberman, attorney for defendant, in Support of Defendant's Motion for Summary Judgment, sworn to November 18, 1999 ("Silberman Aff."), Ex. 3 at 4—5 (Deposition Transcript

of Charles Maier, Director of Loss Prevention for Big M, Inc.). On April 3, 1993, plaintiff was hired by Big M as the Assistant Manager of its Mandee store on Tremont Avenue in the Bronx. *Id.*, Ex. 2 at 38 (Deposition Transcript of Nayda Jimenez). In November of 1995, plaintiff was promoted to the position of Manager of Big M's Mandee store in Astoria Queens. *Id.* at 39–40.

## A. The Astoria Store

As a Manager, plaintiff was responsible for ensuring that her store followed the appropriate cash handling and internal theft prevention procedures. This entailed making sure that the store adhered to Big M's Shrink the Shrink ("STS") guidelines.[1] The STS guidelines require, among other things, that daily spot checks be conducted in the register area, receiving room, fitting room and store security areas. *Id.*, Ex. 5 (STS Guidelines). The spot check for security requires that employee handbags be secured, locks be checked and the store alarm system be tested. *Id.* Plaintiff, as a Manager, was unable to properly perform her loss prevention and cash handling duties, an inability documented in every one of plaintiff's job performance evaluations.

Plaintiff's 1995 annual performance evaluation was completed by Sharon Cohen, Manager, who indicated that plaintiff needed improvement in the area of loss prevention/internal theft. *Id.*, Ex. 6. In her comments, Ms. Cohen indicated that plaintiff must "create a security conscious register area by doing daily spot checks ... [and keep] security areas locked at all times." *Id.* Plaintiff's 1996 evaluation, completed by Rosa Penton–Bamert ("Penton–Bamert"), District Manager, also indicated

that plaintiff needed improvement in loss prevention/internal theft. *Id.*, Ex. 7. In her comments, Penton–Bamert stated that plaintiff must "[f]ollow all the shrink-the-shrink guidelines consistantly [sic] with no exceptions." *Id.* The same is true of plaintiff's 1997 evaluation, also completed by Penton–Bamert. *Id.*, Ex. 8. In that evaluation, plaintiff was instructed that "[a]ll company standards regarding cash handling must be followed at all times, with no exceptions." *Id.* Despite these admonishments, on May 7, 1998, while managing Big M's store in Ridgewood Queens, plaintiff received a merit-based pay raise of $53 per week. Affirmation of Douglas Kaplan, plaintiff's attorney, sworn to August 22, 1999 ("Kaplan Aff."), Ex. H (May 7, 1998 Internal Memorandum). These perceived deficiencies eventually led to a series of unfortunate events.

On May 3, 1997, while plaintiff was managing the Astoria store, a large cash deposit was lost for failure to follow proper cash handling procedures. Pursuant to Big M policy, two deposits are to be made daily. Silberman Aff., Ex. 9 (Policy No. 6.02—Bank Deposits/Daily Sales). As Manager, it was plaintiff's responsibility to ensure that both deposits were made. It was raining on May 3, 1997 and the Assistant Manager did not feel like walking to the bank even though it was only two blocks away. *Id.*, Ex. 2 at 63—64. Consequently, two store deposits totaling $4,449.07 were to be deposited near the end of the day. Unfortunately, the employees making this deposit were robbed and the money was lost. *Id.* at 82.

As a result of this incident, plaintiff received a Final Written Counseling Statement from Penton–Bamert.[2] *Id.*, Ex. 10. In this Statement, Penton–Bamert wrote:

---

1. "Shrink" or "shrinkage" is a retail term that describes merchandise that cannot be accounted for because it has been lost, stolen or misplaced. *Id.*, Ex. 3 at 8.

2. As plaintiff explained, there are three separate levels of intervention at Big M. The first level is a Coaching Log. If performance does not improve, the second level is a Coaching

Performance Action Plan. The third and final level is the Counseling Statement, which according to company policy, indicates that further violations or substandard performance may result in termination. Affidavit of Nayda Jimenez, sworn to December 5, 1999 ("Jimenez Aff."), ¶ 3.

"It is the responsibility of all managers, during their shift, to assure that all company policies regarding 'cash handling' are followed in a timely and safe manner... All procedures must be followed at all times with no exceptions. Failure to have 100% conformance on all cash handling processes will result in termination." *Id.*

On December 29, 1997, plaintiff received a Coaching Performance Action Plan from District Manager Ellen Christopher ("Christopher"). *Id.*, Ex. 11. This was the result of a $50 shortage in the store's cash drawer. *Id.* Then, on January 27, 1998, plaintiff received another Coaching Performance Action Plan from Christopher after she visited the store and discovered that the daily STS checklist had not been completed. *Id.*, Ex. 12.

### B. The Ridgewood Store

On February 12, 1998, plaintiff was again counseled by Christopher who followed up with a written Coaching Log which stated:

> In order for Nayda to continue employment with Big M Inc., Nayda needs to follow all requirements of her job including policies and procedures. [She] must be on time to work everyday (see Action plan on lateness).[3] [She] must follow all policies and procedures to control shrink... At this meeting I expressed to Nayda that this will be her last opportunity to prove she can successfully handle a store management position with Big M, Inc. As of 2/23/98 Nayda will become the store manager of Ridgewood # 111.

*Id.*, Ex. 13.[4] Unfortunately, things did not go well at the new store as the bad luck

---

**3.** Plaintiff received an Action Plan for excessive lateness on February 3, 1998. *Id.*, Ex. 14.

**4.** Plaintiff disputes that she was involuntarily transferred to the Ridgewood store as a last chance opportunity. *See* Jimenez Aff., ¶ 6. Although she admits to having received the one-page Coaching Log which she signed, she states that the document cutoff at the word "feedback" and did not include any of the just quoted language. However, in her deposi-

---

plaintiff encountered in Astoria seemed to have traveled with her to Ridgewood.

### 1. The First Missing Deposit

On July 30, 1998, plaintiff left the Ridgewood store at 7:00 p.m. while other employees stayed until 8:00 p.m. to clean the store. *Id.*, Ex. 2 at 116, 119. A cash deposit of $2,841.29 was left in the store overnight, the money being left in a shoe box in a cage to which the assistant managers had the key. *Id.* at 123–24. When plaintiff came into the store the next morning, Assistant Manager Tanya Napolitano ("Napolitano") and cashier Phyllis Souza ("Souza") told her that the cash receipts from the night before were missing. *Id.* at 117. When Assistant Manager Shashimati Mishra ("Mishra") arrived, the four women searched the store for the money to no avail. *Id.* at 120–21. Plaintiff reported the missing money to Charles Maier, the head of Big M's Loss Prevention Department ("Maier"), who directed them to contact the New York City Police Department ("NYPD"). *Id.*, Ex. 3 at 16. Mishra contacted the police who came to the store where plaintiff, Napolitano and Mishra gave them a report. *Id.*, Ex. 2 at 122.

Maier was unable to determine if anyone had entered the store during the night because someone had unplugged the transformer to the security device which caused a power loss and memory distortion. *Id.*, Ex. 3 at 30. Had it been plugged in, the transformer would have provided the date, time and code number of the person deactivating the alarm system to enter the store. *Id.* at 31. Making sure that the

---

tion, when asked if she recalled reading that statement, plaintiff testified: "Yes, yes. And I did ask her if this is a demotion. It is not a demotion. You're going to be the store manager." Affirmation of David J. Silberman in Further Support of Defendant's Motion for Summary Judgment ("Silberman Reply Aff."), Ex. 1, at 100–01. This apparent discrepancy need not be analyzed further as it is of little legal significance.

transformer is plugged in is the responsibility of the store Manager. *Id.* at 32.

### 2. The Second Missing Deposit

On August 26, 1998, plaintiff was notified by Big M's main office that a validated deposit slip for $2,240 had not been received for July 5, 1998. Company procedure requires that the store send a validated bank deposit slip to the corporate office before it sends its daily sales report to the corporate office. Certification of Charles Maier in Support of Defendant's Motion for Summary Judgment, sworn to December 14, 1999 ("Maier Cert."), ¶ 10. Apparently, Big M's sales audit department asked for the deposit slip because two deposits were supposed to have been made that day and they only received one validated slip from the store. Silberman Aff., Ex. 2 at 126–27. Napolitano checked with the bank and was advised that the second deposit had never been made. *Id.* at 128. Again the police came to the store and were given a report. *Id.* at 130. Notably, the discovery of this loss came nearly two months after the deposit was supposed to have been made despite company procedure requiring that the bank be notified if a validated deposit slip is not received within 10 days. Maier Cert., ¶ 10.

Because of the large amount of money involved in the two missing deposits, Maier conducted further investigation. Silberman Aff., Ex. 3 at 19. He conducted a credit check on all employees who had potential access to the funds and found that plaintiff's credit history was very poor and far worse than anyone else in the store. *Id.* at 20–21. In fact, plaintiff's

credit history revealed two very recent civil judgments against her totaling $4,650. *Id.* at 25, 51.

Maier provided the credit history of all employees in the Ridgewood store to the NYPD and informed them that plaintiff had given her two week notice of resignation. Maier Cert., ¶ 7. On September 2, 1998, two NYPD detectives came to the Ridgewood store and asked plaintiff if she would accompany them to the station house for questioning. Silberman Aff., Ex. 4 at 44. Plaintiff agreed to go and returned approximately an hour later, visibly upset. *Id.* at 45. After she calmed down, Christopher told plaintiff that September 2, 1998 would be her last day. *Id.* at 46. Contrary to defendant's version of the facts,[5] this constituted a termination as plaintiff categorically denies that she told Napolitano or anyone else that she wanted to quit. Jimenez Aff., ¶ 11.

## II. Discussion

### A. Summary Judgment Standard

A moving party will be granted summary judgment if there is no genuine issue of material fact and the party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). All ambiguities and reasonable inferences must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue of material fact, the non-moving party must come forward with specific

---

5. According to defendant, some time prior to September 2, 1998, Napolitano called Christopher and informed her of plaintiff's intention to quit. Silberman Aff., Ex. 4 at 39 (Deposition Transcript of Christopher). Christopher asked to speak to plaintiff who told her that she couldn't take it any more and was giving her two weeks notice. *Id.* Christopher then called Maier and told him that plaintiff had given notice of her intention to resign. *Id.,* Ex. 3 at 22. Maier met with

Christopher and the director of Big M's Human Resources Department and it was decided that plaintiff would be paid for the remainder of the two weeks but would not be allowed to work past September 2, 1998. As this is a motion for summary judgment, I must accept plaintiff's version of the facts rather than defendant's. Whether plaintiff was terminated or resigned is immaterial, however, as the decision to discontinue plaintiff's employment with Big M was not discriminatory, *see infra.*

facts evidencing a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd., v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To defeat a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586, 106 S.Ct. 1348. Nor may a party submit "purely conclusory allegations of discrimination, absent any concrete particulars," *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985), or "create an issue of fact by submitting an affidavit in opposition to a summary judgement motion that, by omission, or addition, contradicts the affiant's previous deposition testimony." *Hayes v. NYC Dept. of Corrections*, 84 F.3d 614, 619 (2d Cir.1996). Rather, the plaintiff must come forward with evidence that would be sufficient to support a jury verdict in her favor. *See Goenaga v. March Of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995).

## B. Legal Standard for Plaintiff's Discrimination Claim

█ Plaintiff's discrimination claim under the New York State Human Rights Law ("NYSHRL") is subject to the same standards of proof established under Title VII of the Civil Rights Act of 1964. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir.1998). In addition, both state and federal courts analyze discrimination claims brought under the NYSHRL under federal case law interpreting Title VII. *See Carter v. Cornell University Medical College*, 976 F.Supp. 224, 232 (S.D.N.Y.1997), *aff'd*, 159 F.3d 1345 (2d Cir.1998).

The well-established three-step analysis for evaluation of a claim of discrimination under Title VII is set forth in *McDonnell*

*Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under this framework, a plaintiff must first prove a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the plaintiff meets this burden, the employer must produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's*, 509 U.S. at 506–07, 113 S.Ct. 2742 (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir.1997). If the defendant produces such evidence, the plaintiff has the ultimate burden of proving that the defendant's reason was merely a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. *See also Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir.1998).

## C. Plaintiff's Prima Facie Case

█ In order to make out a prima facie case of discriminatory discharge, a plaintiff must establish that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse employment action took place under circumstances that give rise to an inference of unlawful discrimination.[6] *See Stern v. Trustees of Columbia University*, 131 F.3d 305, 311–12 (2d Cir.1997) (citing *Burdine*, 450 U.S. at 253 & n. 6, 101 S.Ct. 1089).

█ Here, plaintiff admits that she has no evidence of discrimination. During her deposition, she was questioned as follows:

---

6. Plaintiff substitutes "a preference for someone outside the protected class" as the fourth element. While such a preference can give rise to an inference of discrimination, it is not the only way to do so. Unduly limiting the fourth element does a disservice to plaintiff as she has stated that her replacement as store

manager was an African–American woman. Jimenez Aff., ¶ 12. Although racial discrimination is admittedly different from national origin discrimination, the fact the Big M hired a black woman to replace plaintiff does evidence a tolerance for diversity which tends to refute plaintiff's claim of discrimination.

Q: Nayda, do you have any evidence that Big M discriminated against you because you're Hispanic?

A: No.

Silberman Aff., Ex. 2 at 148. Following a break in the deposition, plaintiff indicated that she wished to change her answer. She then testified:

Q: Nayda, do you, I'll ask you again. Do you have any evidence that Big M discriminated against you because you're Hispanic?

A: I was the only one interrogated.

Q: By the police?

A: Yes.

Q: Okay. Is there anything else that supports your allegation?

A: I was taken to the precinct.

Q: Okay. I understand that. Besides that, is there anything else?

A: No.

*Id.* at 153. The decision of the NYPD to question plaintiff based, in part, on information supplied by Maier was an independent decision on their part. As such, it cannot be imputed to Big M, nor does it give rise to inference of discrimination. In further support of her discrimination claim, plaintiff contends that Big M responded differently when non-Hispanic store managers experienced similar losses and offers statistical proof of discrimination by Big M. I will now turn to these offers of proof.

### i. Comparison to Similarly Situated Non–Hispanic Employees

Plaintiff points to the alleged disparate treatment of three non-Hispanic store managers, Hanna Sciacca ("Sciacca"), Tracey Ciccarelli ("Ciccarelli") and Tanya Napolitano for the proposition that Big M treats non-Hispanic employees more favorably than Hispanic ones. However, none of these comparisons, when scrutinized, offer any evidence of discriminatory animus.

Plaintiff alleges that Sciacca was more favorably treated than her because she was given three months between the discovery of her violation of company policy and her termination. In February of 1996, an audit of Sciacca's store revealed that she had failed to make the twice daily bank deposits required by Policy 6.02. Maier Cert., ¶ 4. Although the violations did not result in any losses to the store, Sciacca was given a Final Written Counseling Statement informing her that any future violations would result in her termination. *Id.* On May 9, a follow-up of the banking procedures in Sciacca's store was conducted which revealed that additional deposits had not been made as per Policy 6.02. *Id.* On May 17, 1996, Sciacca was terminated. *Id.* Thus, the period from the discovery of the additional violations until Sciacca's termination was eight days, not three months.[7] *Id.* Plaintiff's termination was similar to Sciacca's in that it occurred approximately seven days after the discovery of the missing July 5 deposit on August 26, 1998.

Plaintiff points to Ciccarelli as an employee who was not subjected to a credit check and was given an opportunity to explain the questionable transactions leading to her termination. These differences are meaningless. Ciccarelli was terminated as a result of a $3,700 cash shortage at her store. Maier Cert., ¶ 9. On August 17, 1998, Big M's Loss Prevention department was notified of the shortage. *Id.* The ensuing investigation revealed that approximately $3,500 had been withdrawn from petty cash under Ciccarelli's employee number. *Id.* Ciccarelli denied responsibility claiming that another employee must have used her number. *Id.* Because she was store manager and responsible for the overall performance of the store, she was terminated. *Id.* This termination, which occurred approximately two weeks after Loss Prevention conducted interviews of

---

7. Plaintiff received a Final Written Counseling Statement in June of 1997, *see* Silberman Aff., Ex. 10, but was not "terminated" until

September of 1998, a considerably longer period than the three months between Sciacca's original violation and her termination.

store employees, fails to support plaintiff's disparate treatment claim. In fact, it reflects Big M's nondiscriminatory policy of terminating all managers, both Hispanic and non-Hispanic, for cash shortages.

Lastly, plaintiff argues that Napolitano should have been disciplined after Souza was terminated for committing refund fraud in July of 1999. The fact that Napolitano was not discharged, according to plaintiff, is evidence of disparate treatment. In fact, there was no cause for discipline as the daily spot checks in Napolitano's store were fully completed. *Id.,* ¶ 8. Souza performed approximately 20 questionable refund transactions over a six month period during which time she performed hundreds of transactions. *Id.* In order to detect Souza's fraud, the daily spot check selected by Napolitano would have to be one of the questionable transactions out of the hundreds performed by Souza. *Id.* Such precision is not required by the STS Guidelines whose goal is to deter fraud and theft not ensure its discovery in all cases. Again, Napolitano's situation is factually distinguishable from plaintiff's and does not support her discrimination claim.

### ii. Statistical Evidence

Plaintiff offers statistical evidence of defendant's demographic employment patterns in further support of her disparate treatment claim. The statistics offered show the number of white managers as a percentage of total white employees as compared to the number of Hispanic managers as a percentage of total Hispanic employees. They also show the percentage of white managers and Hispanic managers in relation to the total number of managers working out of the home office.[8] These statistics do not, however, reflect the number of terminations of store man-

agers, either white or Hispanic. The fact that the percentage of Hispanic managers is lower than the percentage of white managers does not lend any support to the proposition that Big M engaged in national origin discrimination by terminating plaintiff's position as store manager. As these statistics are of no probative value, they must be rejected. *See, e.g., Hollander v. American Cyanamid Co.,* 172 F.3d 192, 203 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 399, —— L.Ed.2d —— (1999); *Raskin v. Wyatt Co.,* 125 F.3d 55, 67–68 (2d Cir.1997).

In short, plaintiff has failed to provide any evidence giving rise to an inference of discrimination and, therefore, has failed to make out a prima facie case. Assuming, *arguendo,* that plaintiff had made out such a case, summary judgment would still be granted. As discussed below, plaintiff's evidence in no way rebuts defendant's legitimate, nondiscriminatory reason for termination or permits an inference that it was a pretext for discrimination.

### D. Defendant's Proffered Non–Discriminatory Reason

 It is undisputed that plaintiff, as Manager, was responsible for the overall operation of her store. Yet during plaintiff's tenure of employment with Big M, every one of plaintiff's annual job performance evaluations indicated that she was deficient in the area of cash handling and loss prevention. These evaluations were not completed by a single hypercritical supervisor but came from two individuals—Cohen and Pento–Bamert. Plaintiff was also criticized by Christopher with regard to STS procedures. Despite these admonishments, plaintiff continued to exhibit deficient performance in adherence to company guidelines on loss prevention. *See* Silberman Reply Aff., Ex. 1 at 57

---

8. Plaintiff points out that Big M's senior management is all white. This point is irrelevant as Big M is a family-owned business owned by the Mandelbaum family which comprises

the senior management. The fact that the Mandelbaums are not of Hispanic origin does not constitute evidence of discrimination.

(plaintiff admitted than on some days she failed to do the STS procedures).

In addition, there are the missing/stolen deposits. The first lost deposit occurred at the Astoria store and was stolen, in part, because of plaintiff's decision to let the assistant manager hold off making a timely deposit because of inclement weather. Then there are the two missing Ridgewood deposits. Although no one at Big M ever accused plaintiff of stealing the July 30 deposit, if the transformer to the security system had been plugged in, as was plaintiff's responsibility, the culprit would have been discovered. While it is true that plaintiff was not at work on July 5, she would have discovered the missing deposit shortly thereafter, instead of almost two months later, if she had followed company procedure. In short, all of these incidents support the conclusion that Jimenez could not function as an effective store Manager.

Defendant has thus presented a legitimate, nondiscriminatory reason for plaintiff's termination, namely, incompetence. *See Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir.1997) (summary judgment affirmed in national origin discrimination case as court " 'does not sit as a super-personnel department that re-examines an entity's business decisions' ") (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir.1986)). At the third stage of the *McDonnell Douglas* analysis, a plaintiff may defeat summary judgment "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Here, plaintiff has done neither. While it is true that a plaintiff may rely upon the same evidence used to support her prima facie case to show pretext, *see Kerzer v. Kingly Mfg.*, 156 F.3d 396, 402 (2d Cir.1998), there must be some evidence to rely upon. Here, plaintiff has offered no credible evidence from which a rational fact finder could conclude that de-

fendant has illegally discriminated against her. *see Stratton v. Department for the Aging for the City of New York*, 132 F.3d 869, 878 (2d Cir.1997) ("The 'ultimate issue' in an employment case is whether plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an 'impermissible reason,' i.e., a discriminatory reason.") (citing *Fields v. New York State Office of Mental Retardation and Dev. Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997)).

### III. Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted. The Clerk of the Court is directed to close this case.

SO ORDERED.